UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADELINA NAJERA, *individually and on behalf of others similarly situated*,

Plaintiff,

– against –

ATMI KURTISHI *and* ATMI JUNIOR
LAUNDROMAT INC.,

Defendants.

**OPINION AND ORDER**

21-cv-1309 (ER)

Ramos, D.J.:

Adelina Najera brought this action for violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), New York Labor Law §§ 190 *et seq*. and 650 *et seq.* ("NYLL"), and orders of the New York Commissioner of Labor codified at N.Y. Comp. Codes R. & Regs. Tit. 12, § 146-1.6. Doc. 1. The Defendants are Atmi Junior Laundromat Inc., a laundromat located in upper Manhattan, and Atmi Kurtishi, the manager of the laundromat. *See id.* In short, Najera alleges that Defendants failed to pay her properly when she worked at the laundromat as an attendant.

A bench trial was conducted by this Court on February 15, 2023. Min. Entry dated Feb. 15, 2023. This Opinion constitutes the Court's findings of fact and conclusions of law on the allegations asserted in the complaint.

I.   **BACKGROUND**

Najera brought this action for unpaid minimum wages and overtime pursuant to the FLSA and NYLL; violations of the "spread of hours" order of the New York Commissioner of Labor; and violations of the notice, recordkeeping, and wage statement provisions of the NYLL

on February 12, 2021.  Doc. 1.  She sought liquidated damages, interest, attorneys' fees, and costs.  *Id.* ¶ 11.

The parties dispute the length and scope of Najera's employment at the laundromat. Najera initially indicated that she worked on a full time or part time basis over the course of five years, while Defendants argued—and still maintain—that she worked a total of less than ten weeks during 2018, 2019, and 2020.  *Compare* Pl.'s Pretrial Proposed Findings, Doc. 49 at 2 ¶¶ 5–9 (alleging that Najera was employed at the laundromat between March 2015 and March 2020, working part time during the months of April through August and full time during the months of September through March) *with* Defs.' Pretrial Proposed Findings, Doc. 50 ¶¶ 5–6, 14 (alleging that Najera worked at the laundromat during seven non-contiguous weeks on a temporary basis).  Among other things, and as relevant here, they also disagree as to whether the laundromat grossed more than $500,000 in sales during any year between 2015 and 2020, thus calling into question whether Defendants were subject to the requirements of the FLSA. *Compare* Doc. 49 at 3 ¶ 3 *with* Doc. 50 ¶¶ 11–12.

At the trial, Najera testified in support of her claims, and Kurtishi—along with several laundromat employees—testified on behalf of the Defendants.[1]  *See* Trial Tr., Doc. 54. Additionally, the Court received the following exhibits:  (1) the affidavit of Najera ("Najera Aff."), marked Plaintiff's Exhibit A, *id.* at 15:2–15:6; (2) Defendants' payroll records, marked Plaintiff's Exhibit B, *id.* at 70:1–70:6; (3) the affidavit of Reyna Martinez ("Martinez Aff."), a laundromat employee, marked Defendants' Exhibit 1, *id.* at 40:18–41:5; (4) the affidavit of Luljeta Hoxha ("Hoxha Aff."), a laundromat manager, marked Defendants' Exhibit 2, *id.* at 52:14–52:23; the affidavit of Atmi Kurtishi ("Kurtishi Aff."), marked Defendants' Exhibit 3, *id.*

---

[1] Pursuant to the Court's individual rules, all direct testimony was initially received by affidavit.

at 64:10–64:22; and laundromat tax returns for 2015 through 2020, marked as Defendants' Exhibits 4A through 4F, *id.* at 64:24–65:10.

Below, the Court summarizes the facts relevant to the resolution of the instant claims.

## II.   FACTS

### A.   Undisputed Facts

During several periods in 2018, 2019, and 2020, Najera was employed primarily as an attendant the laundromat.  Doc. 56 ¶¶  6, 7; *see also* Doc. 57 at 3–4 ¶¶ 9–16.  As stated above, the parties disagree about the length and scope of Najera's work at the laundromat; however, Najera now only seeks damages "based on the information in Defendants' payroll records, for which there is no dispute."[2]  Doc. 56 ¶ 6 n.1.  In other words, for the purpose of the claims pending before the Court, Najera agrees with Defendants' contentions regarding the time periods during which she worked at the laundromat.  *Id.*  According to the records, those periods were as follows:

In 2018, Najera worked:

- from January 20 to January 26, 2018, for a total of twelve hours, and she was paid $110;

- from February 3 to February 9, 2018, for a total of seven hours, and she was paid $65;

- from February 10 to February 16, 2018, for a total of twelve hours, and she was paid $110;

- from February 17 to February 23, 2018, for a total of twelve hours, and she was paid $110;

- from February 24 to March 2, 2018, for a total of twelve hours, and she was paid $110.

---

[2] After trial, Najera assented that the times listed herein are accurate.  However, Najera maintains that "she worked for the Defendants during" the period of 2015 to 2020.  Doc. 56 ¶ 6 n.1.  In any event, as set fort below, the Court finds that Najera's contentions in this regard are not credible.

In 2019 and 2020, Najera worked:

- from December 27, 2019, to January 2, 2020, for a total of 22 hours, and she was paid $220;

- from March 6 to March 12, 2020, for a total between 30 and 56 hours, and she was paid between $300 and $560, at a rate of ten dollars an hour.[3]

Pl.'s Ex. B; *see also* Doc. 50 ¶¶ 5–6; Doc. 56 ¶¶ 6–7.  Najera was paid in cash.  Doc. 50 ¶ 7;

Doc. 56 ¶ 8.

## B.    Trial Testimony

### 1.    Adelina Najera[4]

In her affidavit, Najera stated that Kurtishi hired her, was in charge of paying her, set her

schedules, and fired her.  Najera Aff. ¶ 5.  She further noted that she was employed by

Defendants from March 2015 to March 2020 as a laundry attendant.  *Id.* ¶¶ 6–7.  Najera's

affidavit also asserted that during the years she was employed, she worked during the following

times:

- during the months of September through March, from 7:00 p.m. until 7:00 a.m. on Sundays, Wednesdays and Thursdays, and from 11:00 p.m. until 7:00 a.m. on Mondays;

- during the months of April through August, from 7:00 p.m. until 7:00 a.m. on Saturdays and Sundays.

*Id.* ¶¶ 8–9.

---

[3] The records—a majority of which are hand-written notes—are inconsistent regarding the number of hours worked by Najera, and paid by Defendants, for the period of March 6, 2020, to March 12, 2002.  Pl.'s Ex. B.  They contain three different sets of figures for that time period.  *Id.* (noting in various locations that Najera worked 30 hours, 44 hours, and 56 hours during the week of March 6 through March 12, 2020).  In her post-trial submission, Najera's counsel relies on the 56-hour figure.  Doc. 56 ¶ 7.

[4] Najera testified with the assistance of a Spanish interpreter.  Trial Tr., Doc. 54 at 13:19–13:21.

The affidavit further stated that during the months of September through March, she was paid a fixed salary of $390 a week, *id.* ¶ 11, and during the months of April through August, she was paid a fixed salary of $100 per day, *id.* ¶ 12. According to Najera, she "never received overtime [pay] (at time and a half) for hours worked in excess of forty (40) hours per week," *id.* ¶ 13, nor did she receive an additional hour of pay for the nights she worked ten or more hours, *id.* ¶ 14. Additionally, the affidavit asserted that her time was not tracked prior to 2019, *id.* ¶ 15, and she was never provided with documentation reflecting the hours she worked, her hourly rate of pay, overtime, or any other record, *id.* ¶¶ 16–17. She further noted that she was never provided with information regarding wage requirements. *Id.* ¶¶ 18–20.

In regard to sales at the laundromat, Najera's noted that, throughout her employment, during a "typical" night shift, she performed $500 to $600 worth of laundry work, and "around 120 people would do their own laundry during a typical night shift." *Id.* ¶¶ 24–25. She claimed that "the laundromat would generate at least $480 from customers who did their own laundry" during her shift. *Id.* ¶ 25. In other words, Najera asserted that the laundromat generated more than $1000 during each of her night shifts.

At trial, Najera also testified about her work schedule at the laundromat. *See generally* Trial Tr., Doc. 54 at 17:6–23:30. As relevant here—and as emphasized by Defendants in their post-trial submissions—Najera's testimony was inconsistent in several regards.[5] *See generally id.*; Doc. 57 at 2–3 ¶¶ 8–15. For example, contrary to the assertions in her affidavit, Najera stated that during the months of September through March, she worked the *day* shift, from *7:00*

---

[5] Defendants ask the Court not to "credit the testimony of [] Najera in its entirety based upon the fact that it is incomprehensible and inconsistent as it relates to the days and hours she worked from 2015 to 2020. In addition, [D]efendant[s] contend[] that the affidavit filed by the plaintiff as evidence [should] be deemed incredible since it completely contradicts plaintiff['s] trial testimony. Furthermore, the trial testimony completely contradicts and is inconsistent with the Plaintiff's complaint." Doc. 57 at 3–4 ¶ 15.

*a.m. to 7:00 p.m.*, on Tuesdays through Thursdays.  Trial Tr., Doc. 54 at 20:18–20:25, 23:7–23:10; *but see* Najera Aff. ¶ 8.   She also provided inconsistent testimony about her work schedule during re-direct examination.  Trial Tr., Doc. 54 at 38:1–38:20.  When discussing her schedule during the periods of time between September and March, Najera testified that "on Tuesdays, Wednesdays, and Thursdays, [she] would work in the morning."  *Id.* at 38:12–38:14; *but see* Najera Aff. ¶ 8.

Najera's trial testimony also touched upon laundromat sales during her shifts.  *See generally* Trial Tr., Doc. 54 at 24:13–36:19.  She reiterated her contention that she would typically do $600 worth of loads during any given night shift, which translated to 500 to 600 pounds of laundry.  *Id.* at 26:1–26:14.  Najera also stated that, in addition to the wash-and-fold services she performed during her shift, "another 120 people would come into the laundromat during that 12-hour period" and do their own laundry.  *Id.* at 27:2–27:7; *see also id.* at 29:15–29:19.  Notably, she testified that *all* machines at the laundromat would be used during *every hour* of her shift.  *Id.* at 27:12–27:23.  When pressed about how it was possible for her to do $600 worth of laundry while other customers were using all of the machines at the laundromat, Najera simply stated that she "would wait for a machine to be free to then use it."  *Id.* at 29:25–30:3.  And when defense counsel asked whether the laundromat would see 120 customers even on "a frigid winter night," for example, or on "rainy, very rainy nights" with "very inclement weather," Najera maintained that the laundromat was always full.  *Id.* at 30:23–31:7.  She asserted that the laundromat remained busy during the *entire* length of her shifts, even between the hours of 1:00 a.m. 5:00 a.m.  *Id.* at 33:5–33:18.

### 2.    Reyna Martinez

The Court then heard testimony from Reyna Martinez on behalf of the Defendants. Martinez's affidavit asserted that she worked at the laundromat from March 2017 to 2021, usually covering night shifts, from 7:00 p.m. to 7:00 a.m., on Mondays, Wednesdays, Fridays, and Saturdays, and occasionally an additional day.  Martinez Aff. ¶¶ 1–2.  It further indicated that Martinez worked alone during her shifts, and she "never worked with Adelina Najera."  *Id.* ¶ 4.  Additionally, the affidavit stated that Martinez "knew the women that worked the 7pm to 7am shift during the years that [she] was working at the Laundromat[,]" and "Adelina Najera or a woman named Adelina did not work the 7pm to 7am shift."  *Id.* ¶ 5.  Nevertheless, it noted that Martinez "would occasionally see [Najera] when [Martinez's] shift ended in the mornings for approximately a few months."  *Id.* ¶ 6.

At trial, Martinez reiterated that she worked the evening shift, from 7 p.m. to 7 a.m., and was never relieved by Najera when her shift ended at 7 a.m. in the morning.  Trial Tr., Doc. 54 at 41:6–41:15.

On cross-examination, counsel for Plaintiff asked Martinez a series of questions about the source of her testimony, the nature of her work at the laundromat, and her pay.  In regard to the source of her testimony, counsel asked Martinez whether Kurtishi had asked her to testify at trial and whether he told her what he wanted her to say.  *Id.* at 41:25–42:2.  Martinez denied that Kurtishi told her what he wanted her to say, noted that she was not told what to write in her affidavit nor offered anything to testify in a "certain way."  *Id.* at 42:3–42:8.

When asked about her work at the laundromat, Martinez testified that she worked overtime, but was not paid a higher rate for her overtime hours.[6]  *Id.* at 42:20–42:25.  She said that she was paid $10 per hour in 2017 and $11 per hour in 2018 through 2020.  *Id.* at 43:5–43:12.  Martinez further stated that she was "aware about the minimum wage, but this was a convenient job for [her] because it was close to [her] home and these were the available hours that [she] had to work at night."  *Id.* at 43:13–43:19.  In other words, Martinez knew that she was being paid below the legal minimum, but she was willing to do so for a number of personal reasons.  Martinez further testified that she was not provided with wage notices, wage statements, or spread of hours compensation.  *Id.* at 44:6–44:14, 47:1–47:17.

Counsel for Najera also asked Martinez a series of questions about Najera's role at the laundromat.  In response to these questions, Martinez asserted that she was not aware about the wages of Najera or any other attendants at the laundromat, and further stated that she only saw Najera "three or four times during the entire time [she] worked [at the laundromat]."  *Id.* at 44:1–44:5, 45:4–45:5.  Specifically, Martinez stated that while there were a number of days during which Najera *did* work the night shift from 7 p.m. to 7 a.m., she did not do so consistently during the entire period of time alleged.  *Id.* at 46:11–46:15.  According to Martinez, Najera did so only when she was called in as a replacement because another night shift attendant was going to be out.  *Id.* at 46:1–46:4.

Counsel for Defendants subsequently asked Martinez several questions on re-direct.  Martinez reasserted that Najera occasionally "would be called [to work] on the day someone wasn't able to go [to the laundromat]," but she did not work on a regular basis.  *Id.* at 49:14–

---

[6] Martinez specifically testified that she worked over 40 hours on some weeks, but was not paid a higher rate for those overtime hours.  Trial Tr., Doc. 54 at 42:20–43:4.

49:24.  Martinez was also asked about the nature of customer traffic during night shifts.  *Id.* at

49:25–51:6.  She stated that the number of customers that would come in to do their own laundry

varied from night to night; specifically, she noted that "[t]here were nights when 20 to 25 people

would come, for the entire night," while there were also "nights when no one would come in."

*Id.* at 50:2–50:4.  She added that she never saw more than a hundred people, or close to a

hundred people, come in during her night shifts.  *Id.* at 50:5–50:15.  In regard to the amount of

laundry she would do herself, Martinez stated that "the most that I got to do ever there was

between 350 and 380 pounds," underscoring that, on average, the average amount of laundry was

closer to 200 pounds.  *Id.* at 50:22–51:3.

### 3. Luljeta Hoxha

Hoxha testified next on behalf of the Defendants.  Her affidavit stated that Hoxha worked

at the laundromat once or twice a week from 2015 to 2015, "managing the inventory."  Hoxha

Aff. ¶¶ 1–2.  It further noted that Hoxha "had knowledge of who worked at the laundromat from

observing the daily and weekly time sheets and logs at the Laundromat."  *Id.* ¶ 4.  Furthermore, it

stated that "Adelina Najera did not regularly work from 2015 to 2020;" rather, "[a]t most[,]

Adelina Najera worked for two or three months in 2018 and 2020.  *Id.* ¶¶ 5–6.  The affidavit

specified that Najera did not work regularly but "worked temporarily and would fill in for

someone if they could not work a shift."  *Id.* ¶¶ 7–8.

Defense counsel also asked Hoxha several questions on direct examination.  Counsel

first asked her about her schedule at the laundromat, and she stated that she would usually go in

at nighttime.  Trial Tr., Doc. 54 at 53:6–53:8.  Hoxha was also asked about her observations

regarding the customers that would go to the laundromat during those times.  *Id.* at 53:9–53:13.

She stated that it was not busy during the nighttime, and she would see "[n]o more than two or

three customers." *Id.* at 53:18–53:19.  Defense counsel then asked Hoxha whether she would

ever see Najera when she would go to the laundromat between 2015 and 2020.  *Id.* at 54:21–

54:23, 54:25–55:1.  Hoxha testified that she never saw Najera at the laundromat.  *Id.* at 54:24.

On cross-examination, counsel for Najera asked Hoxha a series of questions about her

decision to testify and the nature of her work for Kurtishi.  As relevant here, Hoxha stated that

while she did not work at the laundromat, she worked at one of Kurtishi's other businesses—a

liquor store—and would occasionally come to the laundromat to manage inventory.  *Id.* at

55:11–56:5.  She also noted that Kurtishi asked her to testify about whether she saw Najera at the

laundromat, and, in response to a question from Najera's counsel, she said that she would not

want to say anything that would make Kurtishi unhappy.  *Id.* at 55:15–55:25.  Specifically,

Hoxha testified as follows:

> Q.  You want to keep your job, right?
>
> A.  Absolutely.
>
> Q.  And you wouldn't want to say anything today that would make Mr. Kurtishi unhappy, right?
>
> A.  Absolutely, no.
>
> Q.  Did Mr. Kurtishi ask you to testify in a certain way?
>
> A.  Yes, he did.
>
> Q.  What did he say to you?
>
> A.  He said, you're gonna come, because I used to go there, and to manage the inventory, and he said you – if you can come in and testify [ . . . ] [about whether] you s[aw] [Najera] working over there in the nighttime when you used to go there.  I said I never seen her [sic] over there and I'm gonna come and I'm gonna testify.
>
> Q.  But you didn't actually work at the laundromat, correct?
>
> A.  No.

*Id.* at 55:13–56:2.

Counsel for Najera then asked Hoxha whether she was familiar with the "pay practices" at the laundromat. *Id.* at 56:6–56:7. She stated that she was not familiar, and also said that she did not know about the employees' schedules. *Id.* at 56:8–56:17. Hoxha further testified that she had seen the laundromat's timesheets, but not "in detail."[7] *Id.* at 57:1–58:2.

On redirect, Hoxha was asked whether Kurtishi threatened Hoxha "in any way" with regard to the substance of her testimony or otherwise tell her that to say at trial. *Id.* at 62:8–62:11. Hoxha stated that Kurtishi had not done so, and she asserted that her testimony was based upon her knowledge and was truthful. *Id.* at 62:8–62:15. Counsel for the Defendants then asked the following:

> Q. From time to time when you went to the laundromat to input information at the computer and check on things, would you see the names of the women that worked certain shifts when you – around the laundromat?

*Id.* at 62:16–62:19. Hoxha affirmed that this was indeed the case. *Id.* at 62:20.

### 4. Atmi Kurtishi

The final witness to testify was Atmi Kurtishi. His affidavit began by noting that he was the part time manager of the laundromat when Najera worked there, but "the sole shareholder of the defendant corporation is Nazjemie Kurtishi," Kurtishi's wife. Kurtishi Aff. ¶¶ 1, 2. The

---

[7] Counsel for Najera called into question the veracity of the statements laid out in Hoxha's affidavit as he elicited this testimony. Specifically, after Hoxha stated that she did not understand what "observed" meant, a word used in her affidavit, counsel asked Hoxha whether she knew the definition of the word "contemporaneous," also used in her affidavit. Trial Tr., Doc. 54 at 57:3–57:14; Hoxha Aff. ¶¶ 4, 5. Hoxha stated that she did not know the definition of those words, noted that her native language is Albanian, and further testified that her son translated the affidavit for her. Trial Tr., Doc. 54 at 57-3–57:15. However, Hoxha's affidavit did not indicate that it had been translated from another language. *See generally* Hoxha Aff. Counsel for Najera also pointed out inconsistencies between the affidavit and Hoxha's trial testimony in regard to its assertions about her observations of the laundromat's timesheets. Trial Tr., Doc. 54 at 57:18–59:5. Contrary to one of the statements in her affidavit, Hoxha Aff. ¶ 5, Hoxha stated that she did not know about the people who worked at the laundromat based upon her observation of the timesheets, Doc. 58:11–58:17; *see also id.* at 59:2–59:5.

affidavit further stated that the laundromat had ten washing machines and ten dryers[8] during the time at issue, and in regard to pricing, it noted that "the washing machine costs $2.50 per washer," which lasts a half hour, while the "dryer costs 25cents [sic] for 10 minutes." *Id.* ¶ 3. Additionally, the affidavit stated that Kurtishi "would visit the laundromat approximately 3-5 days a week, maybe more if there was an issue with the machines." *Id.* ¶ 5.

As relevant here, the affidavit asserted that the laundromat "did not generate [] income of $500,000 or more [during the period of] 2015 to 2020." *Id.* ¶ 7. It stated that the gross income for the laundromat from 2015 to 2020, pursuant to its tax returns, was as follows:

2015: $114,033.00

2016: $133, 044.00

2017: $170,623.00

2018: $193,071.00

2019: $145,862.00

2020: $115,969.00

*Id.* ¶ 8. The Court admitted the laundromat's tax returns for 2015 to 2020 without objection. Trial Tr., Doc. 54 at 64:24–65:8.

Kurtishi was then asked several additional questions regarding the sales generated at the laundromat. *Id.* at 65:12–65:23. He testified that from 2015 to 2020, during the night shift, the laundromat generated between $30 and $200, adding that "the nighttime is not busy." *Id.* at 65:19–65:21. Kurtishi denied that 120 people would come in during the night shift; he stated that that never happened, but he wished it would. *Id.* at 67:14–67:19.

---

[8] Najera stated that there were 10 washers and 12 dryers during her testimony. Trial Tr., Doc. 54 at 27:9–27:11. According to Hoxha, there were 15 washers and 16 dryers at the laundromat while she worked there. *Id.* at 51:4–51:6.

In regard to Najera's work at the laundromat, Kurtishi said that it was not true that she worked full time from 2015 to 2020. *Id.* at 66:2–66:4. Instead, he indicated that Najera worked "only if the workers, they [did]n't show up, and she came for a couple hours." *Id.* at 66:7–66:8. Kurtishi added that Najera would come in to replace other people when they were out, but she did not work full time, nor did she work every day. *Id.* at 66:7–66:11.

On cross-examination, counsel for Najera asked Kurtishi various questions about his role at the laundromat. *Id.* at 68:12–69:18. As relevant here, Kurtishi testified that he hired Najera and determined her pay, which was $10 per hour. *Id.* He also admitted that he did not provide Najera with a wage notice or wage statements. *Id.* at 70:9–70:20. Additionally, Kurtishi stated that he knew that the minimum wage increased over the course of the past several years, *id.* at 70:22–70:23 (noting that the minimum wage "was $10," then increased to $11 and $15 per hour), and he conceded that he paid Najera below the minimum wage, *id.* at 71:15–71:17. Kurtishi also stated that he did not pay Najera for overtime hours. *Id.* at 72:5–72:8. He then testified that there was nobody in charge of ensuring that the laundromat followed labor laws. *Id.* at 72:17–72:19. Finally, Kurtishi stated that he did not have additional records beyond those provided to the Court at trial. *Id.* at 72:25–73:15.

### C.    Findings on Disputed Issues of Fact

#### 1.    Annual Sales at the Laundromat

Upon review of the parties' testimony and submissions, the Court concludes that, contrary to Najera's allegations, the laundromat did *not* make at least $500,000 in gross sales during any of the years between 2015 and 2020. *See generally* 29 U.S.C. § 203(s)(1)(A)(ii). Najera's testimony regarding the laundromat's sales during her shifts was not credible and was otherwise contradicted by the testimony of Martinez, Hoxha, and Kurtishi. More importantly,

the laundromat's tax returns, which were admitted without objection, conclusively establish that the business never made more than $200,000 a year during the relevant period.

Accordingly, the Court adopts Defendants' proposed finding that the laundromat did not have gross annual sales above $500,000 in any year between 2015 and 2020.

### 2.   **Hours Worked by Najera**

As stated above, following the bench trial, Najera only seeks damages based on the information in Defendants' payroll records, which provide that she only worked during limited periods of time in 2018, 2019, and 2020.  Doc. 56 at 2 ¶ 6 n.1.  Although Najera nonetheless maintains that she worked for additional time between 2015 and 2020, *id.*; *see also* Trial Tr., Doc. 54 at 17:20–21:11, the Court finds that Najera's testimony was not credible and is unsupported by the record.  The testimony of Martinez, Hoxha, and Kurtishi each call into question Najera's allegation that she worked the shifts she contends she worked between 2015 and 2020.  Nor do the business records support her contentions.  *See* Pl.'s Ex. B.  Additionally, as discussed above, Najera contradicted her own allegations pertaining to her work schedules during trial.

Accordingly, the Court finds that Najera only worked for a total of seven, non-contiguous weeks in 2018, 2019, and 2020, as laid out in the laundromat's records admitted at trial.[9]  Pl.'s

---

[9] As noted above, there is no dispute as to the majority of the figures detailed in the business records created by the Defendants, which are as follows:

| Year | Dates | Hours Worked |
|------|-------|--------------|
| 2018 | January 20 – 26, 2018 | 12 |
| | February 3 – 9, 2018 | 7 |
| | February 10 – 16, 2018 | 12 |
| | February 17 – 23, 2018 | 12 |

Ex. B. The evidence before the Court makes clear that Najera did not work for the laundromat on a full time basis, that she only worked more than 40 hours one week, and that she merely served as a substitute attendant when other laundry attendants were unavailable to fill their shifts.

## III.   LEGAL CONCLUSIONS

### A.   FLSA Claims and Jurisdiction

Defendants argue that Najera failed to prove that the laundromat is a "covered enterprise" subject to FLSA requirements pursuant to 29 U.S.C. § 203(s), given that the Defendants "had gross income of less than $500,000.00 in each year from 2015 to 2020." Doc. 57 at 6 ¶ 29. Additionally, they contend that Najera failed to prove that Defendants had employees engaged in commerce, as laid out in the statute. *Id.* Accordingly, Defendants assert that Najera's FLSA claims fail on the merits, and the Court should not exercise supplemental jurisdiction over

---

|             | February 24 – March 2, 2018          | 12 |
| ----------- | ------------------------------------ | -- |
| 2019 – 2020 | December 27, 2019 – January 2, 2020  | 22 |

*See* Pl.'s Ex. B.

The parties only dispute the hours worked by Najera during the week of March 6, 2020, to March 12, 2020. *See* Pl.'s Ex. B; Doc. 50 ¶ 6; Doc. 56 at 2 ¶ 7. The Court concludes that Najera worked 46 hours during that week; indeed, where the records detail the hours worked by Najera on the days between March 6 and March 12, 2020, the total adds to 45.63 hours. *See* Pl's Ex. B. The records include Najera's hours for that week as follows:

| Date           | Time                     | Total              |
| -------------- | ------------------------ | ------------------ |
| March 6, 2020  | 9:52 p.m. to 10:32 a.m.  | 12.67 hours        |
| March 8, 2020  | 6:50 p.m. to 7:00 a.m.   | 12.17 hours        |
| March 9, 2020  | 11:00 p.m. to 7:18 a.m.  | 8.3 hours          |
| March 11, 2020 | 7:00 p.m. to 7:30 a.m.   | 12.5 hours         |
|                |                          | Total Hours: 45.63 |

*Id.*

Najera's state law claims.  Doc. 57 at 13 ¶¶ 6–7.  In response, Najera argues that "[i]n the event the Court determines that jurisdiction for Plaintiff's FLSA claims is unavailable, the Court should maintain jurisdiction over Plaintiff's NYLL claims" pursuant to available caselaw, "particularly in these circumstances where a trial has been held."  Doc. 58 at 2.  Najera emphasizes that "Defendants' liability under the NYLL is clear:  Defendants admitted to wage violations under oath."  *Id.*

The Court agrees with Defendants' assertions regarding Najera's failure to prove her FLSA allegations; however, it nevertheless finds that it may exercise supplemental jurisdiction over Najera's state wage claims for the reasons set forth below.

An employee is only covered by the FLSA's minimum wage and overtime provisions if she is personally "engaged in commerce or in the production of goods for commerce" or if she is "employed in an enterprise engaged in commerce or in the production of goods for commerce."[10] 29 U.S.C. §§ 206(a), 207(a)(1).  As Defendants note, an "enterprise engaged in commerce or in the production of goods for commerce" is one that (1) has employees engaged in commerce or in the production of goods for commerce *and* (2) is an enterprise whose annual gross volume of sales made, or business done, is not less than $500,000.  29 U.S.C. § 203(s).  Here, as set forth above, the Court concludes that Najera was not engaged in commerce or in the production of goods for commerce and Defendants did not have a gross volume of sales of $500,000 during the years of 2015 to 2020.  Accordingly, Defendants' FLSA allegations fail.

This conclusion does not, however, deprive the Court of jurisdiction over Plaintiff's state law claims.  Title 28 of the United States Code, § 1367(a) provides for supplemental jurisdiction

---

[10] As relevant here, "commerce" is defined in the FLSA as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."  29 U.S.C. § 203(b).

over such claims that "form part of the same case or controversy," as Plaintiff's state law claims do here.  Critically, "[v]irtually all of the circuit courts and those district courts in the Second Circuit that have explicitly considered whether the FLSA's $500,000 requirement is jurisdictional agree that it is a requirement that goes to the merits of a claim and is not jurisdictional." *Salustio v. 106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 550 (S.D.N.Y. 2017) (quoting *Angel v. Harvest C-Food Inc.*, No. 14 Civ. 6035 (SHS), 2015 WL 7288644, at *2 (S.D.N.Y. Nov. 16, 2015)) (collecting cases).  This means that "any failure to prove that [an employer] earns $500,000 or more in gross annual sales would not divest the Court of subject matter jurisdiction.  Instead, it would simply mean that plaintiff[s have] failed to meet [their] burden of proof on [their] FLSA-based claims." *Angel*, 2015 WL 7288644, at *3.

To be sure, a district court *may* nonetheless decline supplemental jurisdiction if it has dismissed "all claims over which it has original jurisdiction." *Salustio*, 264 F. Supp. 3d at 551–52; 28 U.S.C. § 1367(c).  However, in so doing, a court should also consider whether dismissal would promote or hinder the values articulated in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), namely:  economy, convenience, fairness, and comity. *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)).  Generally, where a court dismisses all claims over which it has original jurisdiction *before* trial, the balance of these factors will weigh in favor of declining to exercise supplemental jurisdiction over the remaining state law claims. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).  On the other hand, "when the dismissal of the federal claim[s] occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims," declining to exercise supplemental jurisdiction may disserve the relevant interests. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (internal quotation marks and citation omitted).

Here, the Court finds that the *Gibbs* factors weigh against dismissal of Najera's state law claims at this late stage of the proceedings.  *See, e.g.*, *Marcelino v. 374 Food, Inc.*, No. 16 Civ. 6287 (KPF), 2018 WL 1517205, at *11 (S.D.N.Y. Mar. 27, 2018) (declining to dismiss state law claims after the court held a bench trial).  Doing so would be inefficient and inconvenient, particularly in light of the fact that the Court conducted a trial on the merits of Najera's claims. Additionally, the remaining claims do not involve novel or complex issues of state law that would counsel against the Court's adjudication.

For these reasons, while Najera's federal wage-and-hour claims fail as a matter of law, the Court concludes that it nevertheless properly maintains jurisdiction over her pendent state law claims.

### B.      Minimum Wage, Overtime, and Spread of Hours Claims

Under New York law, an employee is entitled to be paid a minimum wage for his labor. NYLL § 652.  The New York hourly minimum wage rate for small employers was $12 in 2018, $13.50 in 2019, and $15 in 2020.  *See* NYLL § 652(a)(ii).  New York law also requires employers to provide overtime pay, a wage that is 50% higher than minimum wage, for hours worked in excess of forty hours per week.  *See* 12 N.Y.C.R.R. § 142-2.2.  An employee may also be entitled to "spread of hours" pay, *id.* at § 142-2.4, which is the length between the beginning and end of the workday.  When an employee's spread of hours is greater than ten, her employer must pay him for one additional hour at the minimum wage rate.  *Id.* at § 142-2.4.

The Court finds that Defendants willfully failed to pay Najera the applicable minimum and overtime wages for the hours she worked at the laundromat as set forth above.  *See* Pl.'s Ex. B.  As relevant here, Defendant Kurtishi testified that Najera was paid at a rate of ten dollars per hour, despite the fact that he knew that the minimum wage was higher than that amount during

18

the time that Najera worked at the laundromat.  Trial Tr., Doc. 54 at 70:22–71:17.  He also admitted that Najera was not paid overtime or provided with spread of hours pay.  *Id.* at 72:5–72:11.  Additionally, when asked whether the laundromat had someone "ensuring that [Defendants] were following labor laws at the laundry," Kurtishi stated—without explanation—that it did not.  *Id.* at 72:17–72:19.

Given these circumstances and the records indicating the hours worked by Najera, the Court finds that Najera is entitled to $527 in unpaid minimum and overtime wages, and $120 in unpaid spread of hours wages.[11]  *See* Damages Chart, Doc. 56-1; *see also* Pl.'s Ex. B.

### C.    Notice and Wage Statement Claims

Under the NYLL, employers must provide employees with wage notices within ten business days of the start of employment.  NYLL § 198(1-b).  A wage notice must be written in English and "in the language identified by each employee as [his] primary language," and it must include several pieces of information, including the employee's pay rate and pay day.  *See* NYLL § 195(1)(a); *Kone v. Joy Constr. Corp.*, No. 15 Civ. 1328 (LTS), 2016 WL 866349, at *5 (S.D.N.Y. Mar. 3, 2016).  An employee who does not receive such notices can recover damages of $50 per workday that the violations occurred, up to a statutory maximum of $5,000.  NYLL § 198(1-b).  Every pay day, an employer must also provide its employees with an earnings statement, including the employee's name, hours worked at regular rates, hours worked at

---

[11] These figures are drawn from Najera's damages chart, Doc. 56-1, except for the minimum wage and overtime calculations for the week of March 6, 2020, to March 12, 2020.  As noted above, the laundromat records show that Najera worked 46 hours during the Week of March 6, 2020, to March 12, 2020; however, Najera's damages chart calculates unpaid wages for 56 total hours.  *Compare* Pl.'s Ex. B *with* Doc. 56-1 at 1.  Accordingly, the Court awards the corresponding amounts for the week of March 6 to March 12, 2020, a 46-hour work week:  40 hours at the minimum wage rate of $15 per hour, amounting to $600, and six hours at the overtime wage of $22.50 per hour, amounting to $135, for a total of $735.  Because Najera was previously paid $440 for that week, the amount of unpaid minimum wage and overtime wages owed is $295, the difference between $735 and $440.  *See* Doc. 56-1 at 1; *see also* Pl.'s Ex. B.

overtime rates, and net wages.  NYLL § 195(3).  An employee who does not receive such statements can recover damages of $250 per day of violation, up to a statutory maximum of $5,000.  NYLL § 198(1-d).

At trial, Kurtishi admitted that Najera was never provided with wage notices or wage statements.  Trial Tr., Doc. 54 at 70:9–70:20.  Najera requests that the Court award $600 for wage notice violations and $3,000 for wage statement violations, corresponding with twelve days of violations.  Doc. 57 at 14 ¶¶ 47, 48.  However, the records and trial testimony only support a finding of eleven days of violations.[12]  *See* Doc. 56 at 14 ¶ 44 n.5; Doc. 56-1 at 1; Pl.'s Ex. B.  The Court thus awards Najera $550 for wage notice violations and $2,750 for wage statement violations.

---

[12] The records show that Najera worked eleven days as follows:

| Year | Dates | Days Worked |
| --- | --- | --- |
| 2018 | January 20 – 26, 2018 | 1 |
| | February 3 – 9, 2018 | 1 |
| | February 10 – 16, 2018 | 1 |
| | February 17 – 23, 2018 | 1 |
| | February 24 – March 2, 2018 | 1 |
| 2019 – 2020 | December 27, 2019 – January 2, 2020 | 2 |
| 2020 | March 6 – March 12, 2020 | 4 |
| | | Total Days:  11 |

*See* Pl.'s Ex. B; Doc. 56 at 14 ¶ 44 n.5.

### D.    Liquidated Damages

Under the NYLL, an employee is entitled to 100% of his underpaid wages as liquidated damages unless his employer can prove "a good faith basis to believe that its underpayment of wages was in compliance with the law."  NYLL § 198(1-a).  The Court finds that Najera is entitled to recover liquidated damages for her unpaid minimum and overtime wages as well as unpaid spread of hours wages.  Accordingly, Defendants shall pay Najera an additional $527 in liquidated damages for unpaid minimum and overtime wages, and $120 in liquidated damages for unpaid spread of hours wages.

## IV.    CONCLUSION

For the reasons set forth above, Najera has established that Defendants violated the NYLL's minimum wage, overtime, spread of hours, and notice provisions, but not the FLSA.  It is therefore ordered that:

1.  Najera is not entitled to recover damages on her causes of action under the FLSA;

2.  For her claims for unpaid minimum and overtime wages under New York law, Najera is entitled to $527 in unpaid wages and $527 in liquidated damages;

3.  For her claim for unpaid spread of hours wags under New York law, Najera is entitled to $120 in unpaid wages and $120 in liquidated damages;

4.  For her notice and wage statement claims, Najera is entitled to a total of $3,300 in damages for Defendants' violations; and

5.  Counsel for Najera may submit an application for attorney's fees by **July 26, 2023**.

It IS SO ORDERED.

Dated:    July 13, 2023
          New York, New York

_____
Edgardo Ramos, U.S.D.J.

21